IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | CRIMINAL NO. 19-2848 JB |
| ) | |
| vs. ) | |
| ) | |
| **VICTOR KEARNEY**, ) | |
| ) | |
| Defendant. ) | |

### UNITED STATES' MEMORANDUM IN SUPPORT OF SENTENCING RECOMMENDATION

The defendant, Victor Kearney (hereinafter, "Defendant"), stands before the Court for sentencing after a jury found him guilty in March 2023 of conspiring with his accountant and tax attorney, the late Robert Fiser (hereinafter, "Fiser"), to conceal millions of dollars in taxable income from the Internal Revenue Service ("IRS") and avoid paying more than $1 million due and owing on this substantial fortune. Defendant has also shown repeated "contempt for the judicial system and courts[,]" engaged in "skullduggery" and "obnoxious conduct[,]" and displayed "appalling litigation habits" in previous civil and bankruptcy cases. *Kearney v. Unsecured Creditors Committee, et al.*, 987 F.3d 1284, 1298, 1301 (10th Cir. 2021). Under these circumstances, and consistent with all proper sentencing considerations, the United States recommends the Court impose an aggregate sentence on Defendant of 60 months in prison, three years of supervised release, $1,188,645.00 in restitution, and 400 hours of community service.

1

I.      Background

On March 10, 2023, a federal jury sitting in Albuquerque, New Mexico found Defendant guilty of one count of conspiracy, in violation of 18 U.S.C. § 371, and one count of making and subscribing a false return, statement, or other document, in violation of 26 U.S.C. § 7206(1). Doc. 131 at 1-2.

The evidence at trial showed Defendant received significant income each year as the beneficiary and co-trustee of two testamentary trusts established after the death of Defendant's first wife, Mary Pat Abruzzo-Kearney. From 1997 to 2013, Defendant received about $16 million in trust income. These trusts were shareholders in Alvarado Realty Company ("ARCO").

At first, Defendant properly reported his trust income for several years on tax returns prepared by H. Myrle Schwalm, a certified public accountant. Then ARCO restructured into a C corporation with subchapter S status. This meant corporate income, losses, deductions, and credits now passed to shareholders for tax purposes. Since the taxes Defendant owed to the government were no longer withheld by ARCO or the trusts, Defendant did not pay them. Instead, Defendant conspired with a different tax preparer, Fiser, to submit knowingly false tax returns for 2007 through 2011 showing no or little trust income with a supposed intent to later amend those returns to include the full trust income. Defendant never filed such amended returns, however, either personally or through Fiser. He owes the IRS $1,188,645.00.

This is not Defendant's first contact with the legal system. In 2013, Defendant filed a lawsuit against his former brothers-in-law, Benjamin and Louis Abruzzo, as co-

trustees. He claimed, in substance, that they mismanaged the trusts to Defendant's financial disadvantage. Benjamin and Louis Abruzzo countersued Defendant. A judge in the Second Judicial District Court for the State of New Mexico resolved all of these claims in favor of the Abruzzos.

During the litigation, District Judge Alan M. Malott heard evidence that prompted him to refer Defendant's case to the IRS for further investigation. Judge Malott also made these findings during the litigation:

> The record is replete with Kearney's repeated breaches of his duty as a Trustee through his self-dealing with third parties, improper disclosures of financial information, and attendant violations of the Orders of this Court, as well as the clear indication that future litigation will ensure, notwithstanding his resignation as a Trustee.

Doc. 152-2 at 24.

> The Court has already found that Mr. Kearney has significant credibility issues. . . . Nothing at trial assuaged those issues. . . . The parties have reached a level of discord, distrust, and distaste such that it would be difficult or impossible for Louis Abruzzo or Benjamin Abruzzo to serve appropriately as Trustees, compensated or uncompensated, into the foreseeable future.

*Id*.

> Clear and convincing evidence exists that Victor Kearney is unable to successfully manage his financial life on the trust distributions he receives, and is significantly in debt. . . . Clear and convincing evidence exists that Mr. Kearney's income tax issues may directly impact the Mary Pat Abruzzo Kearney Trust assets and the remaindermen beneficiaries' interests. . . . Clear and convincing evidence exists that Mary Pat Abruzzo Kearney did not anticipate the facts and circumstances shown by the evidence in this case, and that modification of the Trust is appropriate[.]

*Id*. at 13.

Defendant also filed a bankruptcy case on September 1, 2017. *In re Victor P. Kearney*, Case No. 17-12274-t11, United States Bankruptcy Court, District of New Mexico, Doc. 1. This occurred on the eve of a hearing in the state court action about the appointment of a successor trustee. The bankruptcy case ended with a Chapter 11 discharge granted to Defendant on September 25, 2023. *In re Kearney*, Case No. 17-12274-t11, Doc. 1435. During the bankruptcy proceedings, the Honorable David T. Thuma, United States Bankruptcy Judge, made these findings:

> A strong argument can be made, and the Court believes, that the [Unsecured Creditors' Committee] Plan is in the Debtor's best interest. He will get a bankruptcy discharge. $3,000,000 will pay his debts of more than $8,600,000. He will no longer be able to waste time and money pursuing questionable litigation against his in-laws. He may be forced for a time into gainful employment, which might not be a bad thing. It is time for him to move on. While Debtor cannot see that, it is obvious to most others. After four years or so of reasonable belt-tightening, Debtor can live post-bankruptcy with a fresh start and the prospect of a healthy lifetime income most people would consider a godsend. The Plan was proposed and developed in good faith.

*In re Kearney*, Case No. 17-12274-t11, Doc. 845 at 17.

> There is support in the record for Judge Malott's finding that Ms. Kearney's foremost goal was preserving a good relationship with her brothers. There also is abundant evidence that Ms. Kearney could not have anticipated her husband's obsession with suing her brothers, nor that the trusts she created for his well-being would become his instruments to bludgeon them and the family business with endless, fruitless litigation.

*Id*. at 20.

During the bankruptcy proceedings, the United States Court of Appeals published an opinion affirming the unsecured creditors' committee's plan. *Kearney,* 987 F.3d 1284. In the opinion, the Court found:

> Since 1997, the MPK Trusts have distributed about $800,000 a year to Mr. Kearney. Yet he managed to accumulate over $7 million in debts by the time he filed for Chapter 11 bankruptcy on September 1, 2017. It is apparent from the evidence in this case that Mr. Kearney's financial problems arise not from illness, accident, or bad luck, but from a pattern of his own bad choices.

*Id.* at 1288.

> Mr. Kearney also attacks the bankruptcy court's finding that "[h]e is not a sympathetic plaintiff," saying the court made this erroneous finding "[b]ecause it had no evidence before it that Kearney's claims are without merit . . . ." . . . To the contrary, the record is replete with evidence of Mr. Kearney's obnoxious conduct supporting that finding, including his misconduct with respect to the Trusts, his credibility issues, his contempt for the courts and the judicial process, and his appalling litigation habits.

*Id.* at 1298.

> In sum, Mr. Kearney's established contempt for the judicial system and courts does not bode well for his litigations. His skullduggery not only diminishes his chances of future success as a plaintiff, but also exposes him and the Trusts to further sanctions.

*Id.* at 1301.

In preparation for sentencing in the instant case, members of the Abruzzo family submitted letters to the Court. Notably, Benjamin Abruzzo stated:

> Since the very early months following the passing of our sister Mary Pat, Mr. Kearney has made it very clear that his interest was to extract every dollar possible from our sister's trust and take control over her estate for his sole benefit and ignoring her wishes.

> Regardless of the numerous times he has failed in court, his attempts to take control of our family businesses, his obsurd attempts to defame our family name and tarnish our sister's legacy, he shows no sign of ending the attacks.

*Id*. at 7.

Louis Abruzzo stated:

> Kearney's only goals in life are to take money from people, society, the government and avoid paying it back. He is a master con man and will take the life savings of retirees and employees without any conscience. He was able to attract law firms to represent him without payment and even convinced lawyers Domenici and Fiser to loan him money to sue us. In his self-absorbed, narcissistic mind set, all his problems were generated and inflicted upon him by others. He bears no responsibility or remorse for his delinquent actions and injury to others. I believe he will continue on this path for life.
>
> Our family has been blessed by this community supporting our various businesses that my father and Mr. Bob Nordhaus envisioned and built. Our goal was to honor that by working hard, not risking the farm while improving it, growing it, making jobs and careers available, and serving the public while enhancing New Mexico. I guess the part we did not expect was, above all, to protect the companies from the likes of Kearney. What I did learn is although the judicial system is complicated and slow thanks to appeals and side steps, if you are honest, have staying power, have good counsel (the A-Team), the judges are smart, fair, do their homework and come to the right conclusion. Additionally, the juries also are able to see through the smoke and mirrors and render a fair verdict.

Doc. 164-1 at 6.

Nancy Abruzzo, the wife of a third brother, the late Richard Abruzzo, stated:

> He would stop at nothing, he has no moral boundary and is a master manipulator. The most egregious acts of intimidation include him moving his new family into the old Abruzzo family home right next door to me. A place where Richard and Mary Pat (his wife) once lived and secured the web-site domain names that includes me and my

children's names. Actions that display signs of his real potential to harm, to scare and threaten us in a very intentional way.

Doc. 179 at 1.

Stacy Abruzzo, the wife of Louis Abruzzo, stated:

I feel like Victor's actions are always plotted. They have robbed Louis of hundreds of hours of his time, many hours of sleep, and have brought intentional chaos into our lives for over a decade. He has also robbed so many others (not just us) of a ridiculous amount of money and their peace too. His email address VKARNAGE is a good self-description of what he leaves behind.

Doc. 164-1 at 3.

## II. Law

The Court must impose a sentence within statutory parameters that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a). In fixing a sentence, the Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). The Court must also consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). The Court must also consider the need for the sentence to afford adequate deterrence to criminal conduct, 18 U.S.C. § 3553(a)(2)(B), protect the public from further crimes by the defendant, 18 U.S.C. § 3553(a)(2)(C), and avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, 18 U.S.C. § 3553(a)(6).

In arriving at a proper sentence, the Court must also consider the advisory guidelines, policy statements, and official commentary of the United States Sentencing

Commission. 18 U.S.C. § 3553(b)(1). These guidelines should, however, only serve as a starting point or initial benchmark in determining an appropriate sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007); *United States v. Rosales-Miranda*, 755 F.3d 1253, 1259 (10th Cir. 2014). The guideline ranges are advisory, not mandatory. *United States v. Booker*, 543 U.S. 220 (2005); *United States v. Baca*, 250 F.Supp.3d 1164, 1171 n.1 (D.N.M. 2018) (Browning, J.) ("Attorneys and courts often say that the 'Guidelines' are advisory, but it appears more appropriate to say that the resulting Guidelines ranges are advisory.")

III. <u>Argument</u>

The United States recommends the Court impose an aggregate sentence on Defendant of 60 months in prison, three years of supervised release, $1,188,645.00 in restitution, and 400 hours of community service.[1]

In this case, the U.S. Probation Office (hereinafter, the "Probation Office") has disclosed a Presentence Investigation Report ("PSR") setting forth the advisory sentencing guidelines applicable to Defendant based on his particular crimes and other circumstances. The Probation Office disclosed an initial version of the PSR on May 26,

---

[1] More precisely, the United States recommends a sentence for the conspiracy conviction of 60 months in prison, three years of supervised release, $1,188,645.00 in restitution, and 400 hours of community service, and a concurrent sentence for making and subscribing a false return of 36 months in prison, one year of supervised release, $1,188,645.00 in restitution, and 400 hours of community service. As the guidelines provide, "If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law." U.S.S.G. § 5G1.2(c).

2023, Doc. 153, and an amended version of the PSR on October 6, 2023, Doc. 191. The Probation Office has also disclosed four addenda to the PSR. Docs. 164, 169, 177, 195.

The most recent addendum to the PSR, which was disclosed on November 14, 2023, states that Defendant's guideline imprisonment range is 33-41 months. Doc. 195 at 2. This accounts for the newly enacted downward adjustment available to "certain zero-point offenders" under U.S.S.G. § 4C1.1.[2] Notably, the Probation Office determined Defendant's guideline range by grouping his counts of conviction because they involved the same victim and multiple transactions connected to a common criminal objective, scheme, and plan. Doc. 191 at 9.[3]  Defendant faces statutory maximum terms of

---

[2] Defendant does not deserve further consideration under U.S.S.G. § 5C1.1, comment. (n.10(B)), because he committed serious offenses and his guideline range does not overstate the gravity of his crimes.

[3] According to U.S.S.G. § 1B1.3(a)(2), relevant conduct for an offense of conviction includes "solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction[.]" In this case, the applicable guideline for Defendant's offense conduct, namely U.S.S.G. § 2T1.1, falls within the scope of U.S.S.G. § 3D1.2(d), as referenced above. Thus, each offense of conviction in this case is relevant conduct for the other. In light of this, the United States respectfully requests the Court make a specific finding at sentencing that all of the conduct underlying the conspiracy count is also relevant conduct for the substantive count of making and subscribing a false return, statement, or other document. The Court has already denied Defendant's motion for a new trial and, in doing so, rejected his claim the United States failed to establish a *Klein* conspiracy. Doc. 185. It is foreseeable Defendant might re-assert his claim about a *Klein* conspiracy on appeal. The United States is seeking a ruling from the Court on what sentence it would impose on remand from a successful defense appeal in the event the conspiracy conviction is vacated but the substantive tax offense conviction is affirmed.

imprisonment of five years for conspiracy and three years for making and subscribing a false return. *Id*. at 14.

Defendant's guideline imprisonment range of 33-41 months, which is below the statutory maximum for his conspiracy offense, is a proper starting point and benchmark in determining Defendant's sentence. *See Gall*, 552 U.S. at 49; *Rosales-Miranda*, 755 F.3d at 1259. Importantly, the guidelines hold Defendant meaningfully accountable under U.S.S.G. § 2T1.1(a)(1) for the $1,188,645.00 tax loss he caused the Internal Revenue Service. The guidelines also hold Defendant duly accountable under U.S.S.G. §2T1.1(b)(1) for his failure to report annual income exceeding $10,000 from criminal activity. *See* Doc. 191 at 9.

> [T]he criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. § 2T1.1, Introductory Commentary.

There is "critical deterrent value [in] imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense." *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (quoting *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)). "White collar criminals may be particularly susceptible to general deterrence because "[d]efendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore

can be affected and reduced with serious punishment." *Id.* (quoting *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013)).

The guidelines also correctly deny Defendant any credit for accepting responsibility of his crimes, pursuant to U.S.S.G. § 3E1.1, as such a benefit is "not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1 comment. n.2.

The guidelines also account for Defendant not having a prior criminal history. He is classified as a category one offender and received a specific downward adjustment, pursuant to U.S.S.G. § 4C1.1, for "zero-point offenders." *See* Doc. 195 at 2. The Probation Office did not identify any additional factors that would warrant an upward or downward departure from Defendant's applicable guideline range. Doc. 191 at 16. Accordingly, a guideline term of imprisonment in the range of 33 to 41 is a good starting point for determining Defendant's sentence. Defendant has no mitigating characteristics or circumstances present to an unusual degree that distinguish his case from the heartland of cases covered by the guidelines.

But imposing a guideline sentence on Defendant is, however, insufficient to adequately punish him when all sentencing factors are duly considered. *See* 18 U.S.C. § 3553. The Court must, of course, also look beyond the guidelines to consider a defendant's full history and characteristics in arriving at an appropriate sentence. 18 U.S.C. § 3553(a)(1). In choosing a proper sentence, the Court should, of course, consider the "past life and habits of [the] particular offender." *See Williams v. People of the State*

*of New York*, 337 U.S. 241, 247 (1949). Here is where Defendant's aggravating characteristics and prior conduct distinguish him from the heartland of cases involving other defendants convicted of these crimes. Defendant's unique and disturbing personal history calls for a sentence above the guideline range.

 The PSR, to be sure, contains a great deal of useful information about Defendant's personal biography, history, marriages, physical condition, mental and emotional health, education, employment, and financial condition. The PSR does not, however, cover the full scope of his background. There is additional information to be gleaned from his prior involvement in other legal actions that casts a dark cloud over his reputation and character. The interests of justice dictate that the Court factor this information in arriving at a fitting sentence.

 In this case, Defendant's deplorable personal history and characteristics support a sentence that is significantly higher than usual for a typical first-time federal offender who committed the statutory tax crimes proven at trial. *See* 18 U.S.C. § 3553(a)(1). Indeed, the United States has filed a motion for an upward variance on this basis. Doc. 52.[4]

---

[4] To be sure, the guidelines state: "Although the court must consider 'the history and characteristics of the defendant' among other factors . . . in order to avoid unwarranted sentencing disparities[,] the court should not give them excessive weight. Generally, the most appropriate use of specific offender characteristics is to consider them not as a reason for a sentence outside the applicable guideline range but for other reasons, such as in determining the sentence within the applicable guideline range, the type of sentence (e.g., probation or imprisonment) within the sentencing options available for the applicable Zone on the Sentencing Table, and various other aspects of an appropriate sentence." The United States urges the Court to depart upward pursuant to 18 U.S.C. § 3553 and *Booker* in Defendant's case anyway due to the extraordinary nature of his

Most notably, Defendant has repeatedly abused and disrespected the legal process in bankruptcy and state courts by filing and pursuing dubious claims and engaging in malicious conduct intended to serve his own greedy self-interest and inflict needless emotional harm on his former in-laws, the Abruzzo family. This federal criminal tax case is not an entirely separate matter, but rather a direct outgrowth of Defendant's meritless civil action against the Abruzzos in which the trial judge referred Defendant's tax situation to the IRS for investigation.

The Tenth Circuit has gone so far as to call Defendant's prior behavior in other court cases "skullduggery" and "obnoxious conduct" and specifically acknowledge his "appalling litigation habits" and general "contempt for the judicial system[.]" *Kearney v. Unsecured Creditors Committee, et al.*, 987 F.3d 1284, 1298, 1301 (10th Cir. 2021). The emotional harm the Abruzzo family has suffered from Defendant's conduct is palpable in the letters submitted to the Court by family members.

Defendant also deserves a sentence that is substantially greater than his less culpable co-defendant, Fiser. *See* U.S.S.G. § 3553(a)(6). In this case, Fiser received a prison sentence of 15 months in prison before cooperation and 6 months in prison after cooperation. Defendant is clearly more culpable, however, and, therefore, deserves much longer incarceration. To be sure, Fiser abused the public's trust and used his special skills as a licensed attorney and accountant to help Defendant dodge his taxes, but Fiser

---

misconduct in prior litigation, as specifically recognized by the Tenth Circuit in the bankruptcy case.  This would give sufficient but not excessive weight to Defendant's history and characteristics.

13

received no financial advantage from his crimes and Defendant stiffed Fiser for tax return preparation fees and a personal loan. This puts Defendant in a category with more culpable offenders.

On a related point, the Probation Office sent an email to counsel for both parties on March 8, 2024, described the sentences imposed from fiscal years 2018 to 2022 on the 23 other defendants in criminal history category I with a total offense level of 22 who were subject to the same primary offense guideline at Defendant, i.e., U.S.S.G. § 2T1.1, but did not receive credit under U.S.S.G, §5K1.1 for substantial assistance. Twenty-two of the defendants in this cell received sentences that included terms of imprisonment. For all defendants in the cell, including those who received non-custodial sentences, the average term of imprisonment imposed was 27 months and the median sentence imposed was 33 months. For those defendants sentenced to prison, the average term was 28 months and the median was 33 months.  In this case, Defendant deserves much more because his history and characteristics are extraordinarily bad in ways not covered by the guidelines.

To be sure, the PSR does not identify any factors to justify a variance from the guidelines in this case, either upwards or downwards. Doc. 191 at 17. The PSR also does not address the civil litigation in any detail or take note of the troubling judicial findings about Defendant's character, including the words of the Tenth Circuit.  Accordingly, the Court should not rely on the PSR for a full assessment of aggravating circumstances in this case.

When the Court applies all of the authorized sentencing factors to Defendant's case, as required by 18 U.S.C. § 3553, especially the need to promote respect for the law and afford adequate deterrence, it should find the maximum term of imprisonment authorized by law in this case, 60 months, is sufficient but not greater than necessary to comply with the purposes of sentencing. Defendant has shown flagrant disrespect for the legal process in the past, including the role of judges. A lenient sentence in this case would do nothing to reform his behavior going forward. Rather, a light sentence would encourage Defendant to engage in further misconduct and feed his delusional belief that he deserves preferential treatment from the courts and that the usual rules of society and judicial process don't apply to him. The Court should not indulge Defendant in this way. The Court should give him the maximum term of imprisonment.

IV.   Conclusion

The United States recommends the Court sentence Defendant to an aggregate term of 60 months in prison following by three years of supervised release, order $1,188,645.00 in restitution, and require Defendant to complete 400 hours of community service.

ALEXANDER M.M. UBALLEZ
United States Attorney

/s/ *Sean J. Sullivan*
SEAN J. SULLIVAN
KIMBERLY A. BRAWLEY
Assistant United States Attorneys
Post Office Box 607
Albuquerque, NM 87103
(505) 346-7274

CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on the 8th day of March, 2024, I filed the foregoing pleading electronically through the CM/ECF system, and served counsel of record with this pleading by email.

                                                   Electronically filed
                                                   SEAN J. SULLIVAN
                                                   Assistant U.S. Attorney