IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                                                                                    No. CR 19-2848 JB

VICTOR KEARNEY and ROBERT FISER,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Reconsider Memorandum Opinion and Order Concerning Application of U.S.S.G. § 2T1.1(b)(1) (Doc. 181) and Objection to Same, filed March 8, 2024 (Doc. 201)("Objection"). The primary issue is whether the Court should reconsider the conclusion the Court reached in its Memorandum Opinion and Order, filed July 12, 2023 (Doc. 181)("MOO"), that a 2-level enhancement applies under U.S.S.G. § 2T1.1(b)(1) to Defendant Victor Kearney's sentence, because some of the income, as to which he evaded taxation, was criminally derived. See U.S.S.G. § 2T1.1(b)(1). The Court sustains Kearney's Objection that the § 2T1.1(b)(1) enhancement is inapplicable. The Court therefore will not apply the enhancement. Kearney's offense level is 18 and criminal history is I, establishing a Guideline range of 27-33 months.

## ANALYSIS

The Court agrees with Kearney that the § 2T1.1(b)(1) 2-level enhancement is inapplicable. Without the § 2T1.1(b)(1) enhancement, Kearney's offense level is 18, because of recent amendments to the guidelines for zero-criminal-history defendants. See Second Presentence Investigation Report at 9, filed October 6, 2023 (Doc. 191)("PSR")(describing total offense level

as 22, prior to changes); Fourth Addendum to the Presentence Report at 2, filed November 14, 2023 (Doc. 195)("Fourth Addendum")("[T]he presentence report is amended by way of this addendum to reflect a two-level decrease in the offense level, pursuant to USSG § 4C1.1, the zero-point offender guideline, resulting in a total offense level of 20."). Because Kearney's criminal history is zero, his guideline range is 27-33 months. The Court notes that the United States Probation Office earlier also concluded that § 2T1.1(b)(1) does not apply. See Third Addendum to the Presentence Report at 2, filed July 11, 2023 (Doc. 177)("Third Addendum")("Upon further review, it appears the income derived from the Mary Pat Abruzzo-Kearney Testamentary Trusts B and C was legitimately earned and not derived from criminal activity. Therefore, this enhancement of two levels would not apply.").

Section 2T1.1(b)(1) provides that, "if the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12." U.S.S.G. § 2T1.1(b)(1). The Al Capone model presents the paradigmatic application of this Guidelines enhancement: a tax evasion conviction where, among the monies upon which taxation is avoided, are ill-gotten gains, e.g., from drug-running and other seedy activities. The enhancement's purposes are deterrence and punishing organized criminal conduct: deterrence is served, because criminally derived income is difficult to determine, and, so, in turn, is the tax loss to the United States, so the added punishment incentivizes reporting all income, including criminally derived income; the enhancement also punishes organized criminal activity:

> Failure to report criminally derived income is included as a factor for deterrence purposes. Criminally derived income is generally difficult to establish, so that the tax loss in such cases will tend to be substantially understated. An enhancement for offenders who violate the tax laws as part of a pattern of criminal activity from which they derive a substantial portion of their income also serves to implement the mandate of 28 U.S.C. § 994(i)(2).

U.S.S.G. 2T1.1, Background.  As the Court will discuss, these purposes do not comport with the application to such defendants as Kearney.

I.      **UNITED STATES V. HEARD, 709 F.3D 413 (5TH CIR. 2013)("HEARD") IS NOT ON POINT TO KEARNEY'S SITUATION.**

In Heard, the defendant was convicted for, among other offenses, Klein conspiracy[1] and tax evasion.  See Heard, 709 F.3d at 418 ("Heard . . . and . . . Lambert were convicted of conspiracy to defraud the United States by failing to pay and impeding the IRS's collection of employment taxes. Heard was also convicted of two counts of tax evasion . . . .").  The Klein conspiracy arose out of Heard's conspiracy to frustrate the IRS' collection of taxes that Heard's businesses owed to the IRS.  See Heard, 709 F.3d at 418 ("Heard, Lambert, and other defendants conspired to defraud the United States out of millions of dollars in employment taxes withheld by Heard's security companies.  Overall, the Government alleges that the companies failed to pay a substantial sum in employment taxes, totaling over $5 million.").   Heard directed that the companies divert to him personally what the companies should have paid to the IRS.  See Heard, 709 F.3d at 419 ("Heard had his employees cash corporate checks, often signed . . . with a fictitious name . . . , and give the

---

[1] The Court has explained previously a Klein conspiracy:

> [A] Klein conspiracy is a "section 371 conspiracy where the victim is the IRS and the objective is to defeat its lawful functioning." United States v. Adkinson, 158 F.3d at 1154. Ordinarily, "failure to disclose income ... without more" does not amount to a Klein conspiracy. United States v. McKee, 506 F.3d 225, 239 (3d Cir. 2007). Instead, the United States must show that "there was an *agreement* whose purpose was to *impede the IRS* (the conspiracy), and that each defendant *knowingly participated* in that conspiracy." United States v. Adkinson, 158 F.3d at 1154 (emphasis in original).

United States v. Kearney, No. CR 19-2848, 2023 WL 5176276, at *21 (D.N.M. August 11, 2023)(Browning, J.).

- 3 -

money to him. This behavior formed the basis of the two tax evasion charges. . . . Heard failed to report distributions from [his corporation] SPI in 2001 and 2003."); id. at 419 ("Heard diverted funds from his corporations to finance his lavish lifestyle."). The Klein conspiracy, therefore, was not based on Heard's efforts to frustrate the IRS' collection of Heard's personal tax obligations.

The district court in Heard applied the 2T1.1(b)(1) enhancement, with the Klein conspiracy serving as the predicate criminal conduct for the enhancement:

> Application of the § 2T1.1(b)(1) enhancement was proper here. . . . The enhancement was not applied here, as Heard argues, merely because the funds were not reported on his personal tax return. Rather, the illegality of the funds is demonstrated by Heard's other tax convictions, which concern interference with the IRS's collection of these employment taxes. Even if Heard had reported the withheld employment taxes as income, they would still have been derived from his conspiracy to defraud the United States. The facts contained in the presentence investigation report (P.S.R.), which have not been challenged on appeal, show that over the course of the conspiracy, Heard's companies failed to pay to the IRS millions of dollars in employment taxes.

Heard, 709 F.3d at 424.  The income that Heard criminally derived, and on which he failed to pay taxes, was what he had his companies divert away from the IRS and to himself.  Heard pocketed money belonging to his companies that the companies should have given to the government.

In its MOO, the Court relied on Heard for the proposition that a Klein conspiracy can serve as a 2T1.1(b)(1) predicate: i.e., that income can be criminally derived, and therefore triggering subsection (b)(1)'s application, insofar as it is the product of a Klein conspiracy offense. See MOO at 6 ("Courts have also applied the § 2T1.1(b)(1) enhancement in cases where the predicate criminal activity is conspiracy to defraud the United States, in violation of 18 U.S.C. § 371."); id. at 7 ("Like in Heard, the 'the illegality of the funds' at issue here is 'derived from [Kearney's] conspiracy [with Fiser] to defraud the United States.' . . . Here, Kearney and Fiser conspired to underreport Kearney's trust income." (quoting Heard, 709 F.3d at 423-24)(alterations in MOO)). Although that proposition is true, Heard represents a principle distinct from the facts of Kearney's

case.  The distinction between Heard and Kearney's case is that the income in Heard, criminally derived from a Klein conspiracy, was not Heard's in the first place.  The money was in the possession of Heard's corporations, and, instead of providing that money to the IRS, Heard directed that the money flow to himself.  See Heard, 709 F.3d at 419 ("Heard had his employees cash corporate checks, often signed . . . with a fictitious name . . . , and give the money to him.  This behavior formed the basis of the two tax evasion charges. . . . Heard failed to report distributions from [his corporation, Superior Protection, Inc.,] SPI in 2001 and 2003."); id. at 419 ("Heard diverted funds from his corporations to finance his lavish lifestyle.").  Heard thus, in the same breath, effectuated the Klein conspiracy and made a buck.  Here, however, Kearney's Klein conspiracy was to frustrate the collection of money that he personally owed -- taxes on his trust income.  In Heard, the Klein conspiracy's criminal goal -- evading the corporation's tax obligations -- provided a source of money external to Heard himself.  He pocketed money that did not already belong to him -- income.

  The Heard court's statement is illuminating that, "[e]ven if Heard had reported the withheld employment taxes as income, they would still have been derived from his conspiracy to defraud the United States." Heard, 709 F.3d at 424.  The analogous proposition is not true here.  The influx that Kearney withheld on his taxes was his trust income, like the influx of SPI's employment taxes in Heard.  Arranged in parallel fashion, if Kearney "had reported the withheld [trust income] . . . as income," Heard, 709 F.3d at 424, that income would not "still have been derived from his conspiracy to defraud the United States," Heard, 709 F.3d at 424, because the conspiracy's criminal goal was to defraud the United States by withholding that information from federal tax authorities.  Because the fraudulent tax return and the conspiracy to underreport Kearney's income

concern essentially the same matters -- unlike the separation between the Heard corporation's tax obligations and Heard's personal tax reporting -- the same rule does not hold.

## II.   NO CASELAW SUPPORTS THE APPLICATION OF § 2T1.1(B)(1) IN THE ABSENCE OF SOME CRIMINAL CONDUCT INDEPENDENT OF A DEFENDANT'S TAX EVASION ACTIVITIES.

The Court has identified no authority that applies § 2T1.1(b)(1) in such situations as Kearney's, where the asserted criminal origin of the income is a conspiracy to withhold the money on which the defendant avoided his tax obligations. Cases applying § 2T1.1(b)(1) when a defendant is sentenced for a tax evasion offense involve run-of-the-mill criminal proceeds. For example, § 2T1.1(b)(1) can apply if a tax evasion defendant's income derives in part from prostitution, theft, or identity theft. See United States v. Fairchild, 819 F.3d 399, 415-16 (8th Cir. 2016)("Karlen repeatedly testified that he paid Fairchild for sex. He testified that all of the money that he paid her was in exchange for sex. We discern no error in the court's application of § 2T1.1(b)(1)(2014)."); United States v. Ellis, 440 F.3d 434, 437 (7th Cir. 2006)("Ellis stole from the Sunday offerings, taking thousands of dollars without permission from the church. Moreover, he used APC funds to pay his personal credit cards and life insurance, and racked up thousands more on APC credit cards for personal expenditures."); United States v. Cekosky, 171 F. App'x 785, 787 (11th Cir. 2006)("[T]he income he earned on the bank accounts opened under stolen identities did, in fact, derive from criminal activity . . . . The plain language of the guideline and its commentary makes clear that Cekosky's identity theft is criminal activity from which he earned more than $10,000.").

The application of § 2T1.1(b)(1) to tax evasion defendants also convicted of Klein conspiracy is rare; the Court identifies less than ten such cases. When § 2T1.1(b)(1) has been applied to these defendants, the predicate "criminal activity" for § 2T1.1(b)(1)'s purposes has been

some independent criminal conduct, not the Klein conspiracy that the defendant, in part, engages in to cover up those ill-gotten gains.  For example, in United States v. Gricco, 277 F.3d 339 (3d Cir. 2002)(Alito, J.), the defendants operated a scheme to defraud a municipality's parking structure; they did not report on their tax returns the money they acquired from the parking lot scheme.  See Gricco, 277 F.3d at 346-47 ("Gricco, McCardell, and others made a plan to steal money by substituting customers' real tickets with replacement tickets showing false dates and times of entry. . . . The leading participants in the scheme did not report their unlawful income on their federal income tax returns.").  They were charged with, among other offenses, tax evasion offenses and Klein conspiracy.  Gricco, 277 F.3d at 347 ("[A]n indictment [issued] . . . for conspiracy to defraud the United States by obstructing the lawful function of the Internal Revenue Service in the collection of federal income taxes, . . . tax evasion, . . . and making false federal income tax returns . . . .").  The United States Court of Appeals for the Third Circuit upheld the application of § 2T1.1(b)(1), because, among the defendant's income was unreported income from ill-gotten gains; it was not, however, the Klein conspiracy that was the income's criminal source, but rather the underlying parking structure fraud.  See Gricco, 277 F.3d at 359 ("Subtracting these reported figures from the amounts he gained from the theft scheme shows that he had more than $10,000 in unreported income each year. . . . The sentencing enhancement was proper.").  Similarly, in United States v. McKinney, 686 F.3d 432 (7th Cir. 2012)("McKinney"), a Klein conspiracy defendant validly faced the § 2T1.1(b)(1) enhancement, based not on the Klein conspiracy itself, but rather on a fraudulently obtained loan.  See McKinney, 686 F.3d at 437 ("[T]he mortgage fraud was conduct relevant to McKinney's tax evasion, . . . he had a duty to report the income from the fraudulently obtained mortgage loan, and . . . the district court properly considered his failure to report as it fashioned its sentence.").

Similarly, in United States v. Visconti, 750 F. App'x 543 (9th Cir. 2018)("Visconti"), the predicate criminal activity involved diverting funds away from a corporation to the defendant. Visconti, in this way, represents a similar principle to Heard, where, as the Court notes, the defendant lines his pockets with corporate money not his own. See Visconti, 750 F. App'x at 545 ("John Visconti appeals his convictions for conspiracy to defraud the United States, attempted evasion of income tax, and making a false tax return."); id. at 548 ("The district court did not abuse its discretion in applying a [§ 2T1.1(b)(1)] two-level increase in Visconti's offense level . . . [because t]he government presented evidence at trial that Visconti was diverting money from Axium using off-book accounts, a fake construction company, and a fraudulent salary.").

The United States Court of Appeals for the Tenth Circuit, in the case United States v. Springer, 444 F. App'x 256 (10th Cir. 2011)("Springer"), offers the same proposition that a § 2T1.1(b)(1) enhancement does not lie on a Klein conspiracy alone to frustrate collection of the same taxes the evasion of which forms the basis of the defendant's tax evasion or return falsification conviction: in Springer, the defendant preached a gospel of disobedience to the tax laws, conspired with another individual to avoid their tax obligations, and solicited and received funds from other persons for this purpose. See 444 F. App'x at 259-60 ("Springer founded 'Bondage Breakers Ministries,' which aimed 'to get rid of the IRS[.]' . . . He [and Stilley] . . . devised a scheme to channel Mr. Springer's unreported income through Mr. Stilley's client trust account. Mr. Springer also used his ministry as a front for accepting money." (quoting record on appeal)). The Tenth Circuit upholds enhancement under § 2T1.1(b)(1), but does not on the basis of the overall conspiracy to frustrate the tax system, but rather on the basis of the defendants' fraudulent solicitation and receipt of followers' funds:

> Defendants also challenge their sentence enhancements, beginning with a two-level increase under USSG § 2T1.1(b)(1) for failing to report or identify

>criminal-source income exceeding $10,000. The record clearly supports the district court's finding, however, that defendants committed wire fraud by convincing a client to transfer $250,000 into Mr. Stilley's client trust account, not only to hide the money from the government, but also to defraud their client. The record also supports the court's application of the enhancement based on "defendants' joint representation of [another client, which] was, from its inception, an exercise in fraud and obtaining money under false pretenses," R., Vol. 3 (Sent. Tr. Vol.3) at 3999.

Springer, 444 F. App'x at 266. The Tenth Circuit suggests that the fraudulent receipt supplies the requisite § 2T1.1(b)(1) predicate, and that the Klein conspiracy cannot. In summation, no case, including Heard, predicates 2T1.1(b)(1) "criminal activity" on the Klein conspiracy to frustrate collection of monies, the tax avoidance as to which, under the § 2T1.1 guideline, the defendant faces sentencing.

### III.     STRUCTURAL READINGS OF THE PROVISION SUGGEST THE PROVISION CANNOT APPLY HERE.

Seemingly, the $10,000.00 quantity inquiry would require some inquiry external to the § 2T1.1(b)(1) inquiry itself, in a way that is not self-recursive. Cf. U.S.S.G. § 2T1.1(b)(1) ("If the defendant failed to report . . . income exceeding $10,000 in any year from criminal activity, increase by 2 levels."). Whether the unpaid obligation exceeds $10,000.00, however, is equivalent to asking what the "tax loss" is; in turn, what the tax loss is the court addresses in neighboring parts of the § 2T Guidelines, specifically, in § 2T1.1(a), § 2T1.1(c), and in § 2T4.1. Cf. U.S.S.G. § 2T1.1(a)(1) ("Base Offense Level: . . . Level from § 2T4.1 (Tax Table) corresponding to the tax loss. . . ."); id. § 2T1.1(c) ("If the offense involved tax evasion or a fraudulent or false return, statement, or other document, the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)."); § 2T4.1 (providing the tax loss table and offense levels applicable). Although seemingly repetitive analyses are not foreign to the Guidelines, that the reading of "income exceeding $10,000 . . . from

criminal activity" would repeat the analysis of its immediate neighbor provisions, cf. U.S.S.G. § 2T1.1(a); id. § 2T1.1(c), suggests that this reading of § 2T1.1(b)(1)'s language is not a tenable one; courts, as a matter of interpretation, should avoid reading superfluities into legal texts.

## IV. THE COMMON MEANING OF "INCOME" NECESSITATES THE EXISTENCE OF SOME SOURCE OF MONIES EXTERNAL TO A PERSON'S EXISTING HOLDINGS.

The question is whether Kearney's retention of money from one year to the next he should have paid to the IRS represents a "gain." The Merriam-Webster definition implies the existence of some external source of monies that a person does not already possess -- an external beneficence that lifts a person off their existing baseline, rather than retaining that person at a stable position. Cf. Income, Merriam-Webster, ("gain or . . . benefit . . . that derives from capital or labor" (emphasis added)). Other definitions too suggest the existence of some external source from which a person receives monies. See Income, Black's Law Dictionary (11th ed. 2019)("The money or other form of payment that one receives, usu. periodically, from employment, business, investments, royalties, gifts, and the like." (emphasis added)); Income, Oxford English Dictionary, https://www.oed.com/dictionary/ income_n1?tab=meaning_and_use#801545 ("That which comes in as the periodical produce of one's work, business, lands, or investments (considered in reference to its amount, and commonly expressed in terms of money); annual or periodical receipts accruing to a person or corporation; revenue."). The Supreme Court of the United States has instructed that courts, considering the meaning of the word "income" look to common sense understandings:

> The 'man in the street test' was applied by the Court dissenting in [Eisner v. Macomber, 252 U.S. 189 (1920).] In Eisner, the following language was used by the Court: '… I think that the word 'incomes' in the Sixteenth Amendment should be read in 'a sense most obvious to the common understanding at the time of its adoption.' … For it was for public adoption that it was proposed. … The known purpose of this Amendment was to get rid of nice questions as to what might be direct taxes, and I cannot doubt that most people not lawyers would suppose when they voted for it that they put a question like the present to rest.

§ 5:4. Definition of "income", 1 Mertens Law of Fed. Income Tax'n § 5:4 (footnote omitted).  The common-sense through-line notion of receipt -- of coming-in, "in-come" -- suggests that merely holding onto monies, and not having tax collectors strip them away, does not constitute income.

## V. COMPARISON BETWEEN TAX REFUNDS AND CREDITS SUGGESTS THAT RETENTION ALONE IS NOT INCOME.

Some comparison to tax refunds and tax credits is useful.  A tax refund is a reimbursement to a taxpayer for any excess amount paid in taxes; persons are, in some instances required to report tax refunds, and a refund from Year 1 may be subject to taxation in Year 2.  In this way, a refund is like income -- funds derived from an external source.  A nonrefundable tax credit, on the other hand, reduces a person's tax obligation; unless the credit is refundable and paid out to the taxpayer, then a credit in Year 1 need not be reported in Year 2, and will not be subject to taxation in Year 2.  The analytically important difference is that the refund involves receipt of monies from an external source, while a non-refundable credit involves retention of money otherwise owed.  Kearney's conduct operated like a wrongful tax credit that he gave to himself: like credits generally, it does not involve an outlay of money to Kearney, as would a tax refund, which may be taxable as income.

## VI. THE PURPOSE OF 2T1.1(b)(1) DOES NOT SUPPORT APPLICATION HERE.

The Court last considers again subsection (b)(1)'s purpose.  The Guidelines provide that the enhancement exists for two reasons: (i) as a matter of deterrence, to compensate for the diminished deterrent power of a sentence lacking the enhancement because of the difficulty of establishing income derivable from criminal proceeds; and (ii) to punish systematic criminal activity:

> Failure to report criminally derived income is included as a factor for deterrence purposes. Criminally derived income is generally difficult to establish,

- 11 -

so that the tax loss in such cases will tend to be substantially understated. An enhancement for offenders who violate the tax laws as part of a pattern of criminal activity from which they derive a substantial portion of their income also serves to implement the mandate of 28 U.S.C. § 994(i)(2).

U.S.S.G. 2T1.1, Background. See 28 U.S.C. § 994(i)(2) ("The Commission shall assure that the guidelines specify a sentence to a substantial term of imprisonment for categories of defendants in which the defendant . . . committed the offense as part of a pattern of criminal conduct from which the defendant derived a substantial portion of the defendant's income . . . ."). Neither of these rationales maps well onto the prospect of treating as criminally derived income that wealth a tax dodger retains rather than hand over to the IRS. First, the proposition that "criminally derived income is generally difficult to establish" applies, in the first instance, to the difficulty of establishing, e.g., a drug-lord's illicit income, and so determining the extent to which the drug-lord's reported income understates his actual income and, therefore, taxable income and attendant tax loss to the government. The same formulation poorly applies to unlawful wealth retention: there are no vagaries inherent in determining the amount that a defendant retains unlawfully which exist beyond the threshold, nor a substantive criminal liability question whether the defendant, in actuality, committed tax fraud. Although the second function of the enhancement possibly has a foothold here, there is no second order criminal activity, that pursuant to 28 U.S.C. § 994(i)(2), the enhancement would work, over-and-above, to punish, if the tax fraud offense conduct is one and the same which triggers the 2T1.1 guideline application and the 2T1.1(b)(1) special offense characteristic.

Kearney is correct, therefore, to look to the Ninth Circuit's statement in United States v. Ford, 989 F.2d 347, 350 (9th Cir. 1993)("Ford")("The 'criminal activity' of section 2T1.3(b)(1)[ -- § 2T.1.(b)(1)'s predecessor -- ]cannot refer to tax fraud or tax evasion, since these activities do not actually generate any income; they merely result in an amount of previously

generated income being unlawfully withheld from the taxing authority."). Although the Court does not place great reliance on this statement, because <u>Ford</u> deals primarily with other issues, cf. <u>Ford</u>, 989 F.2d at 350 (describing as an "issue . . . of first impression" whether the 2T1.1(b)(1) predecessor lies on fraudulent acts committed in a foreign country that would be "illegal . . . under American law had it been committed in this country"), the <u>Ford</u> statement quoted above nonetheless is the conclusion that the Court reaches. Accordingly, the Court holds that the 2-level § 2T1.1(b)(1) enhancement does not apply to Kearney on the basis that money that Kearney unlawfully retained, instead of paying out to the IRS, as a result of his conspiracy with Defendant Robert Fiser, is "income . . . from criminal activity." U.S.S.G. § 2T1.1(b)(1). Kearney's total offense level, therefore, is 18, his criminal history category is I, and his Guidelines range is 27-33 months.

**IT IS ORDERED** that the Objection in the Defendant's Motion to Reconsider Memorandum Opinion and Order Concerning Application of U.S.S.G. § 2T1.1(b)(1) (Doc. 181) and Objection to Same, filed March 8, 2024 (Doc. 201), is sustained.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M.M. Uballez
  United States Attorney
Sean J. Sullivan
Kimberly A. Brawley
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

- 14 -

Paul Linnenburger
Lane Linnenburger Lane LLP
Albuquerque, New Mexico
    *Attorneys for Defendant Victor Kearney*

Jason Bowles
Bowles Law Firm
Albuquerque, New Mexico

    *Attorneys for Defendant Robert Fiser*